UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| AARON BERT FODGE,<br><br>                Plaintiff,<br><br>vs.<br><br>BRENT REINKE, SHANE EVANS,<br>RONA SIEGERT, CORIZON INC.,<br>TOM DOLAN, SCOTT LOSSMAN,<br>GLEN BABICH, MURRAY YOUNG,<br>RYAN VALLEY, GRANT ROBERTS,<br>CATHERINE WHINNERY,<br><br>            Defendants. | Case No. 1:13-cv-00331-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

In this pro se prisoner civil rights action, Plaintiff Aaron Bert Fodge is proceeding on his Second Amended Complaint. (Dkt. 23.) Pending before the Court are a Motion for Partial Summary Dismissal and a Motion to Strike Plaintiff's Sur-Reply, filed by Defendants Valley, Whinnery, and Young (Corizon Defendants) (Dkts. 35, 57); a Motion to Dismiss filed by Defendant Siegert (Dkt. 33); and a Motion to Take Judicial Notice, filed by Plaintiff (Dkt. 47). Having reviewed the record, the Court concludes that oral argument is unnecessary. Accordingly, the Court enters the following Order.

# MOTION TO DISMISS STANDARD OF LAW

Defendants' choice to respond to the Complaint by filing a Motion to Dismiss under Federal Rule of Civil Procedure 12 was intended to narrow the issues for the remainder of the litigation. Rule 12 motions are designed to test the pleadings, generally without reference to exhibits or evidence beyond the pleadings. Summary dismissal works slightly different when the plaintiff is a pro se prisoner, because the Prison Litigation Reform Act (PLRA)[1] requires the Court to screen all pro se prisoner complaints to determine whether they have stated a claim upon which relief can be granted before such complaints are served on the defendants. 28 U.S.C. §§ 1915 & 1915A. The Court uses a liberal construction standard in the screening process.

The critical inquiry is whether a constitutional claim, however inartfully pleaded, has an arguable legal and factual basis. *See Jackson v. Arizona*, 885 F.2d 639, 640 (9th Cir.1989).[2] Where claims appear plausible and supported by at least some particular factual allegations, the Court weighs the potential utility of requiring the prisoner to submit an amended complaint against the reality that it may be impossible for the prisoner to submit a pleading that is more detailed than the first, given that prisoners have few legal resources and that much of the evidence they need to support their claims is in the hands of jail officials. After weighing these issues, the Court at times permits claims

---

[1] Pub. L. No. 104-134, 110 Stat. 1321, *as amended*, 42 U.S.C. § 1997e, *et seq.*

[2] The 12(b)(6) authority to dismiss claims as explained in *Jackson* was expanded by the PLRA, giving courts power to dismiss such claims sua sponte and prior to service of process, as explained in *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000).

teeting on the edge of Rule 8 standards to proceed to summary judgment—a stage of litigation where all the evidence is before the Court, and a review of the merits of the potential claims can be accomplished.

Not every questionable claim must wait for summary judgment to be fleshed out, however. The Court retains screening authority to dismiss claims at any time during the litigation under §1915(e).[3] The Court also has the authority to seek additional information from the parties to assess Plaintiff's claims during the screening process. The Court may exercise its discretion to require an amended complaint, a *Watson* questionnaire,[4] a *Spears* hearing,[5] or a *Martinez* report.[6]

The Court's authority to screen pro se prisoner complaints and review prison records often makes the filing of a Rule 12 motion to dismiss—which is designed to test a pleading *without* additional evidentiary support—unnecessary. *See* Fed. R. Civ. P. 12.

---

[3] "Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss [an in forma pauperis] case at any time if the court determines that . . . the action or appeal . . . is frivolous or malicious. . . [or] fails to state a claim upon which relief may be granted." 28 U.S.C. § 1915(e)(2)(B).

[4] In *Watson v. Ault*, 525 F.2d 886, 892 (5th Cir. 1976), the Court determined: "The employment of a form questionnaire is a useful means by which the court can develop the factual basis for the prisoner's complaint."

[5] In *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985), the court authorized an evidentiary hearing in the nature of a Fed.R.Civ.P.12(e) motion for a more definite statement. The hearings were held to supplement questionnaires sent to prisoners to elaborate on vague pleadings. The questions and answers had been considered the equivalent of a response to a 12(e) motion.

[6] In *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978), the trial court ordered (before answer) that the prison officials conduct an investigation of the incident to include an interrogation of those concerned, and file a report with the court, to enable the court to decide the jurisdictional issues and make a determination under section 1915(a). *Id.* at 319. The Ninth Circuit approved of the use of *Martinez* reports in *In re Arizona*, 528 F.3d 652, 659 (9th Cir. 2008).

Where judicial efficiency is served by the Court requiring the plaintiff to provide such items at the outset of the case, the Court can exercise that option.

Where Defendants bring a pre-discovery motion to dismiss for failure to state a claim, the Court generally will not dismiss prisoner claims that have survived initial review, unless Defendants convincingly argue that, under a liberal construction of the pleadings, there is a lack of any cognizable legal theory or a failure to plead sufficient facts to support a cognizable legal theory. *See Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).[7] To survive summary dismissal, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In exercising its discretion to summarily dismiss claims on its own motion or by motion of the defendants, the Court takes into consideration that, in any case, and more so in pro se cases, the law requires that plaintiffs be given an opportunity to amend their pleadings to remedy any deficiencies that were identified during screening or after a motion to dismiss has been adjudicated. *See Lipton v. Pathogenesis Corp*., 284 F.3d 1027, 1039 (9th Cir. 2002) ("It is not unreasonable that plaintiffs may seek amendment after an adverse ruling, and in the normal course district courts should freely grant leave to amend when a viable case may be presented."); *see also Lopez v. Smith*, 203 F.3d 1122, 1128-30 (9th Cir. 2000) (A pro se litigant bringing a civil rights suit must have an

---

[7] *Balistreri* was overruled on other grounds by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 562-63 (2007), to the extent that *Balistreri* followed the rule that, "[a] complaint should not be dismissed under Rule 12(b) (6) 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" 901 F.2d at 699 (citing *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957)).

opportunity to amend the complaint to overcome deficiencies unless it is clear that they cannot be overcome by amendment, because, while Congress's intent in requiring screening is "to curb meritless lawsuits," meritorious lawsuits should not be "swept away in the process.").

Where a party submits evidence beyond the pleadings, the Court may (1) consider it as a supplement to the Complaint under its § 1915 screening authority to determine whether Plaintiff has stated or could state a claim; or (2) convert a Rule 12 motion into a Rule 56 motion for summary judgment, after giving the parties notice and an opportunity to respond before making a ruling on the motion. Fed. R. Civ. P. 12(d). Full or limited discovery also may be warranted. Under Rule 56, where assertions of fact or objections to another party's assertion of facts are not properly supported or addressed, the Court may bring the deficiency to the attention of the parties and give them an opportunity to supplement their briefing and evidence, or may issue any other appropriate order. Fed. R. Civ. P. 56(e)(1).

## FACTUAL BACKGROUND

In 1999, Plaintiff, a prisoner in the custody of the Idaho Department of Correction (IDOC), was given a medical memo for special boots. (Dkt. 11, p. 1.) In August of 2001, Dr. Duane Mabeus issued a letter opining that Plaintiff's right leg is longer than his left leg and that his right foot tends to turn inward until weight is brought upon it. (Dkt. 11, p. 6.) Dr. Mabeus said that this situation put unusual strain on the right outer side of the footgear, and recommended that Plaintiff be provided with high-top boots that could be special-ordered through the prison supply channels if accompanied by a medical

justification letter. "This would be the easiest and cheapest solution to the problem," Dr. Mabeus wrote. (*Id*.) It appears that Plaintiff was provided with the boots at that time.

Eight years later, while housed at Idaho Correctional Center (ISCI), Plaintiff filed a grievance to obtain new "high tops," claiming that the warden told him as long as the medical department would give him a medical memo, she would see that he received the shoes he needed. The grievance was denied. (Dkt. 11, pp. 3-4.) However, the grievance denial was overturned by Warden Pam Sonnen on September 16, 2009. (Dkt. 11, p.5.)

It is unclear what happened between 2009 and 2011. Beginning in mid-2011, Plaintiff's medical records show the following:

| | |
|---|---|
| May 6, 2011 | The chart notes indicate: "Patient here for right ankle pain. Patient has severe laxity in right ankle. Has high top shoes but are not helping much. Still feels like ankle slips—no tendons/ligaments. Is always spraining. Has been told needs ankle fusion. Frequency of occurrence of spasms and pain is such that patient would like to consider options." (Dkt. 48-1, Plaintiff's Exhibits, ISCI 75.) |
| May 23, 2011 | An ankle brace was ordered. (Dkt. 48-1, ISCI 45.) |
| July 6, 2011 | A provider checked the status of the ankle brace order. (*Id*.) |
| Aug. 25, 2011 | It appears that Plaintiff has an appointment with a Rosendahl Foot and Shoe Center representative. The chart notes indicate "Trial fit boots good. Will proceed with mods." (Dkt. 48, ISCI 70.) |
| Aug. 30, 2011 | The boots were delivered to Plaintiff, but because they were black, they were returned for security reasons and dyed brown. |
| Sept. 22, 2011 | Another note to order the ankle brace was entered. (Dkt. 48-1, ISCI 43.) |
| Nov. 17, 2011 | The new boots were delivered to Plaintiff. (Dkt. 48-1, ISCI 70.) |
| Dec. 9, 2011 | A recommendation for high top tennis shoes was made by a prison medical provider. (Dkt. 48-1, ISCI 42.) |

| | |
|---|---|
| Jan. 13, 2012 | A consultation request for "Rosendahl's shoes" was made. |
| Feb. 16, 2012 | Plaintiff reported that he thought he would do better without an ankle brace and with 12-inch-tall boots, which is what worked for him outside of prison. There was some question whether the new boots could accommodate the ankle brace, or whether the boots were too loose when the ankle brace was not worn. Plaintiff voiced concerns that reliance on the ankle brace was making his ankle weaker. The medical provider asked for authorization to provide new boots with sole modifications to support Plaintiff's foot/ankle, with no ankle brace. (Dkt. 48-1, ISCI 70.) |
| Feb. 16, 2012 | Health Services Administrator Tina Bossolono-Williams told the medical provider not to order new boots, but "to pad the current ones to snug them up to allow patient to wear boots without ankle brace." The medical provider reported: "She did not see any reason 14-inch tall boots are necessary." (Dkt. 48-1, ISCI 70.) |
| May 30, 2012 | Plaintiff reported that the Rosendahl boots were coming apart and needed a repair. (Dkt. 48-1, ISCI 240.) |
| Aug. 9, 2012 | Physician's Assistant Matthew Valley made a note "Rosendahl shoe consult - repair vs. new shoes." (Dkt. 48-1, ISCI 39.) The Inter-Disciplinary Report states: "Will wait for Rosendahl consult report to assess need." (Dkt. 48-1, ISCI 67.) Plaintiff had a consultation by a provider at the Rosendahl Center. The Rosendahl consultation "Chart Notes" state that new boots would meet Plaintiff's medical problem, but not his mental expectations. (Dkt. 48-1, ISCI 64.) |
| Oct. 9, 2012 | Plaintiff was evaluated by a provider at the Rosendahl Center and fitted for new boots. (Dkt. 48-1, ISCI 64.) |
| Feb. 7, 2013 | Plaintiff was re-evaluated by a provider at the Rosendahl Center. Plaintiff's new boots appeared to be coming unglued and the stitching was coming apart. The boots were glued back together on this date. Plaintiff also asked for two pairs of firefighter boots from SICI. (Dkt. 48-1, ISCI 64.) |
| Feb.13, 2013 | Plaintiff requested two pairs of "Rosendahl boots," because, he asserted, one is always in disrepair, and that would ensure that he always had a pair available to him to wear while the other was being repaired. He stated that the last time they were sent out for repair, it |

took four months for them to be returned to him.  (Dkt. 48-1, ISCI 65.)

| | |
|---|---|
| Feb. 20, 2013 | A note was made for "Aetrex shoes" with an AFO ankle brace. |
| March 11, 2013 | Plaintiff refused the Aetrex shoes, because he "said it violated his grievance."  (Dkt. 48-1, ISCI 38.) |
| Sept. 11, 2013 | Plaintiff was approved to get a new ankle brace, because the old one was broken.  (Dkt. 48-1, Plaintiff's Exhibits, ISCI 59-60.) |
| Sept. 17, 2013 | Plaintiff received a new ankle brace. (Dkt. 48-1, Plaintiff's Exhibits, ISCI 354.) |

In the Second Amended Complaint, Plaintiff asserts that Defendants have not taken "the appropriate steps to properly treat his medical problem with the proper footwear, boots with an 8" top on them, which results in potentially permanent damage upon himself for he still suffers in pain due to their denial of his request." (Dkt. 23, ¶ 32.) He states that the boots he now has are coming apart and give no support at all, causing more damage to his ankle. He further alleges that medical staff have given him orthotics designed to address problems other than the one he has, and that the orthotics do not work for his particular problem.

Current medical providers have opined that there is nothing in the medical records to indicate that he needs boots rather than an ankle brace, because a brace "is more supportive than a boot and will fit [his] needs adequately." (Dkt. 3-1, p. 15.)

Plaintiff alleges that the following medical providers and administrators have been involved in denial of the boots: Rona Siegert, IDOC Health Services Director; Dr. Murray Young; Dr. Catherine Whinnery; and Ryan Valley, CMS Health Services Administrator. Plaintiff brings federal civil rights claims against Defendants in their

individual and official capacities, as well as state law negligence and medical malpractice claims.

## MOTION TO TAKE JUDICIAL NOTICE

Plaintiff asks the Court to take judicial notice of the court special master report of Dr. Marc F. Stern, a physician who evaluated the medical care provided at ISCI by Correctional Medical Services (CMS)/Corizon and who provided recommendations to the Court, in a currently-pending prisoner class action lawsuit, *Balla v. Idaho State Board of Correction*, Case No. 81-cv-1165-BLW, Docket No. 822. (Dkt. 47.) Plaintiff argues that the report is relevant because his injury occurred at ISCI and was treated by CMS/Corizon employees.

Federal Rule of Evidence 201 provides that a Court may take judicial notice of an adjudicative fact that is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

Because the subject matter of the Special Master's Report is disputed, as is written on the notice at the top of each page of the Report, the contents of the Report cannot be the subject of judicial notice. Accordingly, the Motion to Take Judicial Notice will be denied. Plaintiff can use the expert report as part of Plaintiff's evidence in this case at a later time and to the extent that he meets necessary evidentiary requirements, such as foundation and relevancy.

**DISCUSSION OF CORIZON DEFENDANTS' MOTION TO DISMISS**

**1.      Pre-Litigation Screening Requirement for State Law Claims**

Defendants Dr. Whinnery and Dr. Young argue that, because Plaintiff failed to complete the state law prelitigation screening panel procedure before filing his lawsuit, he should be barred from pursuing his claims of medical malpractice and negligence. Pursuant to Idaho Code § 6-1001, Plaintiff is required to participate in a prelitigation screening hearing before an Idaho Board of Medicine panel. The purpose of the panel is to review the plaintiff's evidence and provide the panel's comments and observations regarding the merits of the medical malpractice claim. *James v. Buck*, 727 P.2d 1136, 1137 (1986). The proceedings are "informal and non-binding, but nonetheless compulsory as a condition precedent to litigation." I.C. § 6-1001.

Plaintiff does not contest the fact that he did not use the prelitigation screening panel procedure. Instead, he argues that his state law claims against Dr. Whinnery and Dr. Young are not subject to prelitigation screening, because he brings them under "Title 5, Negligence," and "Title 6, Chapter 9, regarding Claims Against Governmental Entities," not Title 6, Chapter 10, governing medical malpractice claims. (Response, p. 9.) Plaintiff's argument is supported by Title 6, Chapter 9, § 6-902A, to the extent that "[c]laims against a supervisory physician for failure to properly perform supervisory duties shall not be subject to the requirements of chapter 10, title 6, Idaho Code," which includes the prelitigation screening panel procedures.

Plaintiff is master of his pleadings, and Defendants may not re-characterize his claims differently than he interprets them. Insofar as Plaintiff has characterized his claims

under the supervisory physician provision of I.C. § 6-902A or another statutory provision that does not challenge any actual medical care either doctor rendered to him, he will be limited to challenging the administrative actions of these doctors.

As to Plaintiff's clarification that he is bringing his other "negligence" claim under Title 5 (Proceedings in Civil Actions in Courts of Record)—rather than under Title 6, Chapter 8 (negligence) or Title 6, Chapter 10 (medical malpractice)—the Court will exercise its authority to screen Plaintiff's claim. Title 5 does not set forth any causes of action, but merely dictates procedures for how all causes of action are to be brought and addressed in the state courts. No particular "negligence" cause of action is expressed or implied by the language of Title 5. Further, a plaintiff may not bring a state law cause of action based upon an Idaho Code section unless that section was intended by the legislature to be actionable by private citizens. *See Yoakum v. Hartford Fire Ins. Co.*, 923 P.2d 416 (Idaho 1996). This claim will be dismissed for failure to state a claim upon which relief can be granted, but Plaintiff may proceed on his supervisory claim, to the extent that the record contains facts supporting such a claim.

**2.     Defendant Valley's Contention that the Complaint Fails to State a Claim against Him**

Two individuals surnamed "Valley" are referenced in the Second Amended Complaint and Plaintiff's medical records. Matthew Valley is the name of a physician's assistant who is or was employed by Corizon; he provided some treatment to Plaintiff, and he is mentioned in the body of the Second Amended Complaint. He is not a defendant. (Second Amended Complaint, Dkt. 23, p. 8, ¶ 20.) Ryan Valley is the health

services administrator for Corizon, and he is the defendant named in the caption of the Second Amended Complaint and in a listing of the "defendants" in the body of the Second Amended Complaint (Dkt. 23.) Defendant Ryan Valley asserts that Plaintiff has merely named him and set forth his title in the Complaint, but has alleged no facts supporting a claim that Valley was deliberately indifferent to Plaintiff's serious medical needs.

The only allegation about Ryan Valley in the Second Amended Complaint is that "Plaintiff on or about April 11, 2013, submitted a[n] IDOC Concern Form to Tina Williams, Corizon Inc.'s [health services administrator] who defendant Valley is the successor in office to, requesting that his boots be replaced for they were wor[n] out and the stitching was coming out." (Dkt. 23, p. 8, ¶ 21.) Plaintiff goes on to allege that Nurse Wingert "intercepted" the concern form. (*Id*., p. 9.)

The Court agrees that Plaintiff has not stated a claim for damages against Ryan Valley in his individual capacity. However, if Ryan Valley is still the health services administrator, Plaintiff may continue to proceed against Valley in his official capacity on Plaintiff's claim for injunctive relief only. Therefore, the motion will be granted in part, and denied in part.

## DICUSSION OF DEFENDANT SIEGERT'S MOTION TO DISMISS

### 1.  Failure to State a Claim and Qualified Immunity

Defendant Rona Siegert asserts that Plaintiff has not sufficiently alleged that she was involved in Plaintiff's medical treatment. Plaintiff has alleged that Siegert was

"directly involved in the approval and/or denial of plaintiff's treatment for his medical needs complaint of herein more fully below." (Dkt. 23, p. 4.)

To supplement his pleadings, Plaintiff has submitted the minutes of a July 30, 2012, *Balla* class action monitoring meeting that Siegert attended where Plaintiff's boot issue was discussed. The record shows: "Fodge - neoprene shoes – No HSR submitted, no allergy listed in medical file. Appointment 12/12/11 with Dr. Rosendahl, given high tops at that time." (Dkt. 48-1, p. 7.) It is unclear what was discussed at the meeting about Plaintiff's shoes (e.g., if he has an allergy to neoprene, then that issue is largely unrelated to the ankle stability issue alleged in this lawsuit), and the note suggests that Siegert was notified that the problem was being addressed with a visit to an outside provider.

Plaintiff alleges in his pleadings that Siegert reviewed his written grievances on the medical boot issue and refused to take any action to remedy the situation nearly a year later. On May 25, 2013: "Rona Siegert's reply was: 'Discussion regarding boots has been exhausted through Grievance appeal.'" (*Id.*, p. 11, ¶ 27.) Siegert again refused to take any action on a subsequent request for treatment on June 14, 2013, when she said, "This issue has been addressed in previous concerns and grievances." (*Id.*, p. 11, ¶ 28.)

The prison grievance system is for the purpose of solving prisoner problems. Plaintiff had a medical problem—he believed he needed special boots to address a foot and ankle problem. As IDOC's health services director, Rona Siegert is alleged to have been designated by prison officials to respond to prisoner grievances about medical issues. Plaintiff alleges that Ms. Siegert had notice of Plaintiff's ongoing problem and

refused to do anything further to solve his problem. This is enough to infer deliberate indifference—knowledge, plus a conscious disregard of an allegedly serious health need.

The current status of the law is that defendants who are involved in reviewing claims in the administrative grievance process may have liability for the constitutional violations complained within the grievances they processed, depending upon (1) the type and timing of problem complained of, and (2) the role of the defendant in the process. For example, an appeals coordinator cannot *cause* or *contribute to* a *completed* constitutional violation that occurred in the past and is not remediable by any action the reviewer might take. *See, e.g., George v. Smith*, 507 F.3d 605, 609–610 (7th Cir. 2007) ("[a] guard who stands and watches while another guard beats a prisoner violates the Constitution; a guard who rejects an administrative complaint about a completed act of misconduct does not"). If, however, the alleged constitutional violation is ongoing, and the defendant reviewing the inmate concern form or grievance has the duty and authority to review the propriety of the medical treatment and take action to remedy the alleged deficiencies (not necessarily by providing medical care themselves, but by obtaining the answer to whether the medical care was proper from a person with medical training and directing a remedy to be implemented), then a cause of action lies, because the defendant "knew of an ongoing constitutional violation and . . . had the authority and opportunity to prevent the ongoing violation," under supervisory liability principles applicable to § 1983 actions. *See Herrera v. Hall*, 2010 WL 2791586 at *4 (citing *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989)).

Where claims are asserted against persons who supervise the provision of prison medical care, the question is not whether the supervisor was "directly involved" in the plaintiff's diagnosis, but whether the plaintiff has sufficiently alleged or provided evidence from which a jury could find that the supervisor's knowing failure to address the treating provider's deficient care rendered Plaintiff's medical treatment constitutionally inadequate. *See Gonzalez v. Ahmed*, 2014 WL 4444292, at *8 (N.D. Cal. 2014). For example, in *Gonzalez*, summary judgment was denied as to the supervisory liability of Dr. Chudy in reviewing Dr. Ahmed's care of Plaintiff under the following circumstances:

> Under Plaintiff's version of the facts, Dr. Ahmed flatly refused to examine him because Dr. Ahmed was tired at the end of the day. Plaintiff further alleges that Dr. Chudy and Dr. Sepulveda knew that Dr. Ahmed had denied Plaintiff care, but nonetheless ordered Plaintiff to return to Dr. Ahmed's care.

*Id.* at *8.

In *Gonzalez*, the court further determined that Plaintiff's complaints to Dr. Chudy were not merely about past health care, but "referred to an ongoing and substantial risk to his health, and requested that Dr. Ahmed's actions be investigated so as to prevent future incidents." *Id*. The court further denied Dr. Chudy's request for application of qualified immunity, reasoning that, "under Plaintiff's version of the facts, a prison official could not reasonably believe that forcing Plaintiff to return to Dr. Ahmed's care unsupervised would not be an effective denial of, or intentional interference with, Plaintiff's necessary medical treatment." *Id*. at *9.

The Court concludes that Siegert has not demonstrated that Plaintiff has failed to state a claim upon which relief can be granted. Nor has Siegert demonstrated her entitlement to qualified immunity without an additional factual showing that it was not within her scope of authority or duties to review prisoner grievances about the provision of medical care or a showing that Plaintiff, in fact, was provided the minimum level of medical care that he was due under the Eighth Amendment.

After Plaintiff has had opportunity to review Siegert's voluntary disclosures regarding the extent and nature of Siegert's job duties, authority, and involvement in reviewing Plaintiff's health care complaints, and Plaintiff has conducted any follow-up discovery regarding Siegert and Plaintiff's medical care, Siegert may file a motion for summary judgment on qualified immunity and liability, if appropriate.

**2.    State Law Claims**

The Idaho Tort Claims Act (ITCA) provides for a 180–day notice requirement for informing the government of the basis for a tort claim. See I.C. § 6–906. The 180-day time period begins to run "from the date the claim arose or reasonably should have been discovered, whichever is later." *Id.* Failure to provide notice within the 180-day time period is grounds for dismissal of the claim. *Mitchell v. Bingham Memorial Hospital*, 942 P.2d 544, 548-49 (Idaho 1997).

Siegert asserts that Plaintiff has alleged that Siegert's wrongful acts began on September 25, 2012, which means that the ITCA notice had to be filed on or before March 24, 2013. However, Plaintiff's notice was filed on May 13, 2013, more than 180 days later. Plaintiff has provided nothing to controvert these facts. Accordingly, the Court

concludes that Siegert is entitled to dismissal of the state law claims against her for failure to comply with the ITCA.

## DISCLOSURE AND DISCOVERY

Plaintiff has presented a large number of relevant medical records that show he was provided with several solutions for his foot and ankle problems over the course of several years. The remaining question for summary judgment is whether Defendants can show that medical providers who were competent to diagnose and treat Plaintiff's ankle laxity and leg length issues, with any resultant problems, steadily pursued reasonable solutions to try to solve Plaintiff's problems and that he has received footwear and/or appliances that adequately address his problems.

Deliberate indifference may be shown if prison medical staff "ignored outside expert advice, relying solely on their own medical judgment" for an unreasonably long period of time, such that a jury could find that they acted in a "medically unacceptable" and "subjectively reckless" manner. *Snow v. McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012)[8] (denial of double hip replacement surgery to death–row inmate whose hips had degenerated so badly he could not walk and was in constant, severe pain was a jury question). Where an inmate s medical records show that "the defendants provided medical care, medications, and specialist referrals" to the inmate during the time period in question, the inmate can prove deliberate indifference "by showing that prison

_____

[8] *Snow* was overruled in part on other grounds by *Peralta v. Dillard*, 744 F.3d 1076 (2014) (medical provider who lacked authority over budgeting decisions was entitled to a jury instruction that the jury could consider, for purposes of the claim for damages against him personally, whether prison resources were such that it was impossible for him to provide the care the inmate needed, but prospective injunctive relief claims against such a defendant in his official capacity remain viable).

administrators or physicians denied, delayed, or intentionally interfered with [treatment]," or that they delivered medical care in a deliberately indifferent manner. *Snow*, 681 F.3d at 986. "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) (alteration omitted) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

The Court will permit the parties to proceed to disclosure and discovery for a 90-day period of time. Plaintiff has already submitted a large number of documents detailing his medical history. It would be helpful to the Court for the parties to provide evidence to aid the Court in answering the following questions:

A.      Who examined Plaintiff at Rosendahl Shoe and Foot Center, what is the examiner's credentials, and what diagnosis did the examiner provide?

B.      Is there any dispute regarding Dr. Mabeus's description of Plaintiff's different leg-length physical problem, and is there also an ankle laxity problem that is different from or related to the different leg-length issue?

C.      Does the wearing of an ankle brace weaken Plaintiff's ankle?

D.      Exactly how does the particular boot, plus any orthotic appliance or ankle brace given to Plaintiff, address the physical problems and diagnoses of Plaintiff?

E.      What is the type, location, and nature of the pain Plaintiff alleges to be suffering?

F.      Is Plaintiff still suffering pain from his current type of footwear?

G. How would the boot Plaintiff wants alleviate the pain he suffers?

H. Does Plaintiff have any evidence to counter the Rosendahl provider's statement that different boots are not medically necessary?

I. What is the Aetrex shoe, and why did Plaintiff reject it?

J. Is the Rosendahl boot breaking at the stress points described by Dr. Mabeus?

K. Have the boots been repaired in a timely manner?

## CONCLUSION

The Motion to Dismiss filed by Defendants Dr. Murray Young, Dr. Catherine Whinnery, and Ryan Valley is granted as to (1) all claims against Ryan Valley in his individual capacity; (2) state law claims of medical negligence or medical malpractice of Dr. Young and Dr. Whinnery that arise from allegations of their personal participation in the medical treatment of Plaintiff (not in a supervisory capacity); and (3) state law claims of negligence brought under Title 5 of the Idaho Code. It is denied in all other respects. Defendant Siegert's Motion to Dismiss is granted as to the state claims asserted against her, but denied in all other respects.

## ORDER

**IT IS ORDERED:**

1. The Clerk of Court shall correct the record to reflect that Plaintiff's Application for in Forma Pauperis Status (Dkt. 13) was granted by the Order issued at Docket No. 43.

2.      Defendant Rona Siegert's Motion to Dismiss (Dkt. 33) is GRANTED in part as to the state law claims asserted against her, and DENIED in part as to the federal claims.

3.      The Motion to Dismiss filed by Defendants Ryan Valley, Catherine Whinnery, and Murray Young (Dkt. 35) is GRANTED in part as to all claims against Ryan Valley in his individual capacity, and all claims against Catherine Whinnery and Murray Young for any personal participation in treating Plaintiff (not to include supervisory physician claims).

4.      Plaintiff's § 1983 "negligence" claim based on Title 5 is DISMISSED for failure to state a claim upon which relief can be granted.

5.      Plaintiff's Motion to Take Judicial Notice (Dkt. 47) is DENIED.

**IT IS FURTHER ORDERED** that the parties shall follow this pretrial schedule:

A.      <u>**Disclosure of Relevant Information and Documents:**</u> If the parties have not already done so, no later than 30 days after entry of this Order, the parties shall provide each other with relevant information and documents pertaining to the claims and defenses in this case, including the names of individuals likely to have discoverable information, along with the subject of the information, as well as any relevant documents in their possession, in a redacted form if necessary for security or privilege purposes; and, if necessary, they shall provide a security/privilege log sufficiently describing any undisclosed relevant documents which are alleged to be subject to nondisclosure. Any party may request that the Court conduct an in camera review of withheld documents or

information. In camera documents are to be filed ex parte under seal, and not provided by email or mail.

B.    **Amendment of Complaint**. Any proposed amended complaints, with accompanying motions, must be filed no later than **60 days** after entry of this Order.

C.    **Completion of Discovery and Requests for Subpoenas:** All discovery shall be completed no later than **90 days** after entry of this Order. Discovery requests must be made far enough in advance to allow *completion* of the discovery in accordance with the applicable federal rules *prior* to this discovery cut-off date. Discovery is exchanged between parties, not filed with the Court. The Court is not involved in discovery unless the parties are unable to work out their differences between themselves as to whether the discovery responses are appropriate. In addition, all requests for subpoenas duces tecum (pretrial production of documents by nonparties) must be made within **60 days** after entry of this Order. No requests for subpoenas duces tecum will be entertained after that date. (Subpoena requests for trial appearances of witnesses shall not be filed until the case is set for trial.) To obtain a subpoena duces tecum for production of documents by nonparties, Plaintiff must first submit to the Court the names, addresses, and the type of information sought from each person or entity to be subpoenaed, and Plaintiff must explain the relevance of the items requested to the claims. The Court will then determine whether the subpoenas should issue.

D.    **Depositions**: Depositions, if any, shall be completed no later than **90 days after entry of this Order**. If Defendants wish to take the deposition of Plaintiff or other witnesses who are incarcerated, leave to do so is hereby granted. Any such depositions

shall be preceded by **10 days'** written notice to all parties and deponents. The parties and counsel shall be professional and courteous to one another during the depositions. The court reporter, who is not a representative of Defendants, will be present to record all of the words spoken by Plaintiff (or other deponent), counsel, and any other persons at the deposition. If Plaintiff (or another deponent) wishes to ensure that the court reporter did not make mistakes in transcribing the deposition into a written form, then Plaintiff can request the opportunity to read and sign the deposition, noting any discrepancies between what is transcribed and what Plaintiff believes was said. If Plaintiff wishes to take depositions, Plaintiff must file a motion requesting permission to do so, specifically showing the ability to comply with the applicable Federal Rules of Civil Procedure by providing the names of the proposed persons to be deposed, the name and address of the court reporter who will take the deposition, the estimated cost for the court reporter's time and the recording, and the source of funds for payment of the cost.

E.  **Dispositive Motions:** All motions for summary judgment and other potentially dispositive motions shall be filed with accompanying briefs no later than **120 days after entry of this Order**. Responsive briefs to such motions shall be filed within **30 days** after service of motions. Reply briefs, if any, shall be filed within **14 days** after service of responses. All motions, responses, and replies shall conform to Rule 7.1 of the Local Rules for the District of Idaho. **Neither party shall file supplemental responses, replies, affidavits, or other filings not authorized by the Local Rules without prior leave of Court. No motion or memorandum, typed or handwritten, shall exceed 20 pages in length.**

F.   **Alternative Dispute Resolution (ADR)**. Should Plaintiff and any

Defendant wish to attend a settlement conference, they should file a stipulation to attend

settlement conference, and the case shall then be referred to the Court's ADR Director.

DATED: January 7, 2015

B. Lynn Winmill
Chief Judge
United States District Court